2012 Ark. App. 704

**Jeffrey WINKLER, Appellant**

**v.**

**STATE of Arkansas, Appellee.**

**No. CA CR 11–1223.**

Court of Appeals of Arkansas.

Dec. 12, 2012.

Robinson & Zakrzewski, P.A., by: Luke Zakrzewski, for appellant.

Dustin McDaniel, Att'y Gen., by: LeaAnn J. Irvin, Ass't Att'y Gen., for appellee.

DOUG MARTIN, Judge.

Appellant Jeffrey Winkler appeals from a Jefferson County jury's verdict finding him guilty of conspiracy to commit the following offenses: kidnapping, aggravated robbery, theft of property, and aggravated residential burglary. Winkler was sentenced to nine years' imprisonment. Winkler argues that the trial court erred in (1) denying his directed-verdict motion because there was no overt act, (2) refusing to require the State to select one offense as the object of the conspiracy, and (3) by imposing a sentence for a nonexistent offense. We find no error and affirm.

At trial, Sylvester L. Jones testified that on October 21, 2010, he was walking with a friend when Winkler approached them about doing yard work. Jones accepted the job offer, and Winkler gave Jones his telephone number and asked that Jones call him later that afternoon. Jones called and agreed to meet Winkler in the parking lot at Brookshire's grocery store. According to Jones, when he asked about the yard work, Winkler said, "I want you to do something else a little bit more ... a little killing." Jones testified that Winkler first asked him to "rough up" a man named Stringfellow because the man was having an affair with Winkler's wife, but then Winkler brought up the subject of killing Mrs. Winkler. Jones testified that Winkler asked him to go to the Dollarway

school where Mrs. Winkler worked and "just break her neck and drive off in her vehicle." Jones refused, and Winkler instead suggested that the crime take place at the home he shared with Mrs. Winkler. Winkler told Jones that he could pay only $700 up front and would pay the rest when the job was complete. Jones asked to think about the matter. That evening, Jones spoke with his cousin, a police officer at the Altheimer Police Department, who arranged for Jones to meet with officers at the Pine Bluff Police Department on October 22, 2010.

Jones testified that Pine Bluff police officers gave him a recording device that resembled a key fob, and, at the officers request, Jones called Winkler to arrange another meeting at Brookshire's. During the recorded telephone conversation, Jones asked whether Winkler could pay him $100 to $200 immediately. Winkler said, "I ain't got anything with me.... I'm gonna get you your money if we go through with this[,] okay[?]"

Once in the parking lot at Brookshire's, Jones got into Winkler's vehicle. Although Jones thought the recording device was recording his conversation with Winkler, it was later determined that it had not. Jones testified that, during the drive to Winkler's ho me, Winkler asked whether he had a weapon, to which Jones responded that he did not. According to Jones, Winkler told him that he would provide one. Jones stated that Winkler asked him to slump down in the seat because he did not want his elderly neighbors to see Jones. When they arrived at Winkler's home, Winkler instructed Jones to break into the house through a side door using a brick, Winkler assured Jones that he would turn off the security alarm, Winkler took Jones into the home and showed Jones the bathroom where Mrs. Winkler dressed in the morning; and Winkler di-

rected Jones "to go ahead and just shoot her right there and make it look like a burglary and move fast."

Jones further testified that Winkler led him through the house, advising him as to items he could steal. Winkler told Jones how to remove a mounted flat-screen television without damaging the wall. Winkler told Jones that he could steal the other televisions but added, jokingly, to leave one for him to watch. Winkler then pointed out a gun cabinet and a computer in the living room. Winkler led Jones to the master bedroom and told Jones that Mrs. Winkler kept all of her "good jewelry" under the mattress and advised Jones that, although Mrs. Winkler's wedding band was gold, the diamond was fake. Winkler showed Jones a drawer full of more jewelry, and Winkler separated the valuable jewelry from the "costume jewelry." Winkler told Jones that he could take $300 to $400 from his wife's purse but asked that he not take the credit cards because they could be traced. According to Jones, Winkler told him to put the stolen items in Mrs. Winkler's truck and leave.

Jones testified that Winkler wanted "the job" done by Monday morning. When Winkler and Jones returned to the Brookshire's parking lot, the police arrested Winkler.

Detective Bill Wiegand with the Pine Bluff Police Department testified that, following Winkler's arrest, police conducted an inventory of his vehicle. Wiegand found a loaded .38–caliber pistol in the vehicle's console. Winkler was taken to the department, where he gave a taped statement after being advised of his *Miranda* rights. Winkler told police that he was in love with a woman from his workplace and that he wanted someone to "rough up" the woman's boyfriend, Mark Stringfellow, who was "giving him some trouble." According to Winkler, "the wife deal" was an afterthought. Winkler told police that he had asked Jones to "kind of break in and kind of scare my wife, I guess." Wiegand asked whether Winkler had implied to Jones that he wanted his wife killed, and Winkler said, "[Jones] might have took it that way, yeah." Winkler explained, "I guess I was *looking for* a way out of my marriage." Winkler said that he had hoped that scaring his wife would cause her to move on in order to "free him up" to be with his coworker.

In the statement, Winkler told police that, although he told Jones that he did not want to know the details, he thought Jones might tie up his wife or disable the telephones. Winkler also stated that he and Jones discussed where Jones would park and how he would come through the woods, climb the fence, and throw a brick through the back door. Winkler stated that he did not plan to leave the back door unlocked because he thought he needed a forced entry. Winkler stated that he had told Jones there was to be no shooting in the house because the neighbors would hear. Wiegand asked why any shooting would occur if Jones was only burglarizing the house, and Winkler said, "Well, I was intending if he scared her—is what I'm thinking." Winkler told police that he went to work at 6:00 a.m. and that his wife went to work around 6:15 a.m. so Jones had "a short window" of time to carry out their plan. Winkler stated that he had three televisions that he knew would be "attractive" to Jones. He stated that he had told Jones that his wife's wedding band was gold but the diamond was fake. Winkler told police that he and Jones had discussed Winkler's paying Jones $700 to "[b]reak in and steal some stuff, scare her, and leave."

Wiegand resumed his testimony, stating that the approximate value of a fifty-two-

inch Sony flat-screen television was $1,500; the value of a forty-inch Samsung flat-screen television was $1,000; and the value of a thirty-two-inch Visio flat-screen television was about $400. Wiegand stated that he obtained those figures from Amazon, which gives a high and low range of value, and that his figures were the mid-range value. Wiegand testified that he could not determine the value of the jewelry. Wiegand testified that Winkler had told him that he kept a .38–caliber revolver in a nightstand and that a .38–caliber revolver was recovered in the console of Winkler's vehicle, along with a concealed-handgun permit.

Winkler moved for a directed verdict, arguing that he and Jones were at the planning stage of the conspiracy and that no overt act had been committed. The trial court denied the motion, and Winkler presented witnesses for the defense's case-in-chief, including his wife, Pam Winkler, who testified regarding Stringfellow's harassment of Winkler. Winkler's renewed motion for directed verdict was denied, and the matter was submitted to the jury for deliberation.

The verdict form indicates that the jury found that Winkler conspired to commit kidnapping, aggravated robbery, theft of property valued at $2,500 or more, and aggravated residential burglary. Winkler presented numerous witnesses during the penalty phase, including his wife, daughter, friends, and coworkers, all of whom made glowing remarks about Winkler's character. The jury then sentenced Winkler to nine years imprisonment for one count of conspiracy, a Class A felony.

### 1. *Sufficiency of the Evidence*

Winkler argues that the trial court erred in denying his motion for directed verdict. A motion for directed verdict is a challenge to the sufficiency of the evidence. *Jones v. State,* 45 Ark.App. 28, 871 S.W.2d 403 (1994). On appeal, we review the evidence and all reasonable inferences deducible therefrom in the light most favorable to the State and will affirm if the finding of guilt is supported by substantial evidence. *Id.* Substantial evidence is evidence of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other, without requiring resort to speculation or conjecture. *Id.*

A person conspires to commit an offense if, with the purpose of promoting or facilitating the commission of any criminal offense, (1) the person agrees with another person or other persons that one or more of the persons will engage in conduct that constitutes that offense or the person will aid in the planning or commission of that criminal offense, and (2) the person or another person with whom the person conspires does any overt act in pursuance of the conspiracy. Ark.Code Ann. § 5–3–401(1), (2) (Repl.2006). It is well settled that a conspiracy may be proved by circumstances and the inferences to be drawn from the course of conduct of the alleged conspirators. *Jones, supra,* The State was required to prove that there was an agreement by the parties to commit a crime and that one of the conspirators did at least a minimal act in furtherance of that agreement. *Id.* It is settled doctrine that the crime of conspiracy is complete on the agreement to violate the law as implemented by one or more overt acts, however innocent such act standing alone may be, and it is not dependent on the success or failure of the planned scheme. *United States v. Joiner,* 418 F.3d 863 (8th Cir. 2005) (citing *United States v. Littlefield,* 594 F.2d 682 (8th Cir.1979)).

The State described Winkler's overt acts in the information.

[T]hat [Winkler] or any other person with whom he conspired on October 22, 2010, did an overt act in pursuance of the conspiracy in that [Winkler] did meet with Sylvester Jones and at that time, [Winkler] did take Sylvester Jones to Winkler's residence and showed him the inside of the premises, and discussed how to break in the residence, how to subdue his wife and identified the property to be taken from the residence.

On appeal, Winkler contends that neither he nor Jones committed any overt act. Winker does not dispute the factual allegations in the State's information but maintains that, although he and Jones planned to commit an offense, Winkler did not pay J ones any sum of money, Jones knew that they did not have a deal until Jones was paid, Winkler did not provide Jones with a firearm, and Jones had not left his own residence in the early morning hours and begun the journey to Winkler's house intending to execute the plan. Winkler argues that his and Jones's activities at Winkler's residence constituted nothing more than planning, "however involved it may have been," but that planning does not constitute an overt act.

Winkler relies on *Shrader v. State,* 13 Ark.App. 17, 678 S.W.2d 777 (1984), for the proposition that planning an offense does not constitute an overt act and points to the following language in that case. "[Appellant's co-conspirator] had already committed the offense of criminal conspiracy by *planning the commission of an offense and committing the overt act* of helping to procure a silencer for the gun to be used in the planned offense." *Shrader,* 13 Ark.App. at 26, 678 S.W.2d at 781 (emphasis added). Winkler similarly relies on *Guinn v. State,* 27 Ark.App. 260, 771 S.W.2d 290 (1989):

The evidence presented at trial established that appellant offered to burn a dwelling belonging to Doyle Hall to enable him to collect insurance proceeds. Hall informed the authorities, and an undercover agent, posing as a relative of Hall's, thereafter *met with appellant to discuss the plan,* An agreement was entered into under which the appellant would burn Hall's buildings for the purpose of collecting insurance proceeds and would purchase from the undercover officer ten pounds of marijuana for resale at other places. *Overt acts in furtherance of the agreement were thereafter committed,*

*Guinn,* 27 Ark.App. at 264, 771 S.W.2d at 291 (emphasis added). Winkler maintains that the language in *Shrader* and *Guinn* suggests that an overt act, separate and distinct from planning, is required to sustain a conviction for conspiracy.

We agree with Winkler's general proposition that planning does not constitute an overt act, however, we disagree with Winkler's contention that his conduct in taking Jones to his residence did not constitute an overt act. Winkler took Jones to the residence to preview the crime scene, and in doing so, Winkler showed Jones the route to travel and warned him to avoid being detected by neighbors. Once at the house, Winkler gave Jones step-by-step instructions on how to achieve the purpose of their agreement, in that Winkler provided Jones with the means to break into the house, took Jones inside the house and directed him to the area where his wife would be found early in the morning, and led Jones through the house while advising him as to the value of various items that he could steal. Winkler and Jones essentially engaged in an on-site rehearsal in preparation for a criminal performance that Winkler scheduled to begin on the following Monday between 6:00 a.m. and 6:15 a.m. The jury could have reasonably concluded

that the above-described conduct constituted an overt act in furtherance of a conspiracy to commit various crimes. Viewing the evidence in the light most favorable to the State, we hold that Winkler's conviction for criminal conspiracy is supported by substantial evidence.

## II. Conspiracy to Commit Multiple Offenses

The State initially charged Winkler with one count of conspiracy to commit kidnapping, one count of conspiracy to commit aggravated robbery, one count of conspiracy to commit theft of property, and one count of conspiracy to commit aggravated residential burglary.[1] Winkler filed a pretrial motion requesting that the trial court order the State to select one "object offense" because statutory law permits the prosecution of only one conspiracy stemming from a single agreement. In response, the State filed an amended information charging Winkler with one count of criminal conspiracy to commit (A) kidnapping, and/or (B) aggravated robbery, and/or (C) theft of property, and/or (D) aggravated residential burglary, following a hearing on Winkler's motion, the trial court found that one conspiracy could involve multiple object offenses.

"If a person conspires to commit a number of criminal offenses, the person commits only one (1) conspiracy if the multiple offenses are the object of the same agreement or continuous conspiratorial relationship." Ark.Code Ann. § 5–3–403 (Repl.2006). Ac cording to Winkler,

he was essentially prosecuted for multiple conspiracy offenses. Winkler argues that the trial court erred in not requiring the State, at the outset of the proceedings, to select one of the multiple object offenses to prosecute because section 5–3–403 precludes more than one conspiracy prosecution.

Both Winkler and the State rely on our supreme court's holding in *McMillen v. State*, 302 Ark. 601, 792 S.W.2d 315 (1990). McMillan, a police officer, was charged with conspiring with another officer and a criminal to commit various crimes and split the proceeds. McMillan was ultimately charged and scheduled for separate trials on (1) conspiracy to commit theft of a trailer: (2) accomplice to murder, and (3) conspiracy to commit four offenses, consisting of burglaries and robberies. McMillan was tried and convicted on conspiracy to commit theft of a trailer. While an appeal was pending, McMillan filed a writ of prohibition and successfully challenged the charge of accomplice to murder on double-jeopardy grounds.[2]

The issue on appeal in *McMillan, supra*, was McMillan's challenge, again on double-jeopardy grounds, to his subsequent conviction for conspiracy to commit four offenses. McMillan argued that the second conspiracy charge should have been merged with the earlier conspiracy to commit theft of a trailer because they were part of the same agreement or continuous, conspiratorial relationship.

1. *See* Ark.Code Ann. § 5–11–102(b)(1) (Repl. 2006) (kidnapping is a Class Y felony); Ark. Code Ann. § 5–12–103(b) (Repl.2006) (aggravated robbery is a Class Y felony); Ark.Code Ann. § 5–36–103(b)(1)(A) (Repl.2006) (theft of property valued at $2,500 or more is a Class B felony); Ark.Code Ann. § 5–39–204(b) (Supp.2009) (aggravated residential burglary is a Class Y felony).

*See also* Ark.Code Ann. § 5–3–404(1), (3) (Repl.2006) (criminal conspiracy is a Class A felony if an object of the conspiracy is commission of a Class Y felony and is a Class C felony if the object of the conspiracy is commission of a Class B felony).

2. *See McMillan v. Donovan*, 301 Ark. 393, 784 S.W.2d 752 (1990).

Quoting *Braverman v. United States,* 317 U.S. 49, 53, 63 S.Ct. 99, 87 L.Ed. 23 (1942), our supreme court in *McMillan* wrote,

> For when a single agreement to commit one or more substantive crimes is evidenced by an overt act, as the statute requires, the precise nature and extent of the conspiracy must be determined by reference to the agreement which embraces and defines its objects. Whether the object of a single agreement is to commit one or many crimes, it is in either case that agreement which constitutes the conspiracy which the statute punishes. The one agreement cannot be taken to be several agreements and hence several conspiracies because it envisages the violation of several statutes rather than one. The allegation in a single count of conspiracy to commit several crimes is not duplicitous, for [t]he conspiracy is the crime, and that is one, however diverse its objects.

*McMillen v. State,* 302 Ark. 601, 603, 792 S.W.2d 315, 316 (1990) (internal quotations omitted).

Our supreme court rejected the trial court's finding that more than one conspiratorial agreement or relationship existed and agreed with McMillan that the second conspiracy charge should have been merged with the earlier conspiracy to commit theft of a trailer, of which McMillan had previously been convicted. Our supreme court thus reversed and dismissed the second conspiracy conviction.

The State contends that it properly charged Winkler with one count of conspiracy to commit multiple offenses in accordance with *McMillan.* On the other hand, Winkler focuses on the *McMillan* court's conclusion, specifically, its use of the word "prosecution":

> In view of *Braverman* and the General Assembly's adoption of [Ark.Code Ann.] § 5–3–403, the law seems well settled that a "single agreement" or "continuous conspiratorial relationship" constitutes a single conspiracy offense whether intended to culminate in |₁₂distinct offenses or in successive violations of the same statute. *Section 5–3–403 clearly precludes more than one conspiracy prosecution as a result of a single agreement or relationship, See* Original Commentary to § 5–3–403.

*Id.* at 603–04, 792 S.W.2d at 316 (emphasis added).

■ We find no error in the trial court's allowing the prosecution of one count of conspiracy to commit multiple object offenses. Unlike the situation in *McMillan,* Winkler was subjected to one prosecution, even though the conspiracy involved multiple object offenses. Winkler concedes that the way in which the State charged him with multiple offenses in the final amended information was "not wholly improper" and that section 5–3–403 does not specifically provide that the prosecution of multiple offenses is prohibited. In the end, Winkler was convicted of only one conspiracy, "however diverse its objects."

We will briefly address Winkler's argument concerning prejudice. Winkler asserts that there is inherent prejudice in permitting the State to go forward with "the prosecution of multiple conspiracy offenses" because of the danger that the jury will seek the maximum penalty upon learning that it is limited to imposing punishment for only one conspiracy, after having found him guilty of conspiring to commit all the object offenses. Winkler contends that he suffered such prejudice because he had no criminal history, there was no evidence that he committed any misconduct aside from actions stemming from his affection for a coworker; and he presented a "wealth" of mitigating evidence, including his wife's testimony that

Winkler made a mistake but she had forgiven him and still loved her spouse of thirty-eight years. We do not agree that Winkler suffered the prejudice described above, given that the ₁₃jury clearly did not impose the maximum penalty. Winkler faced serving thirty years in prison, but the jury sentenced him to nine years' imprisonment.[3]

### III.  Sentencing

Winkler argues that he received an illegal or void sentence because the "purported offense of which he was found guilty does not and cannot exist under the statutory scheme now in effect." Winkler notes that, while the verdict form indicates that his conviction was for "conspiracy," the judgment and commitment order indicates that he was convicted of one count of "conspiracy to commit kidnapping, aggravated robbery, theft of property, and aggravated residential burglary." Winkler argues that "conspiracy," standing alone, is not an offense because the legislature has tied its classification to that of an object offense, and the latter offense does not exist because different object offenses may have different classifications, such that classifying a conspiracy to commit multiple offenses is impossible "absent a statutory mechanism by which any combination of every object offense in all instances would merge." Winkler argues that the trial court erred in merging the multiple object offenses, consisting of three Class Y felonies and one Class B felony, without statutory authority.[4]

A sentence is void or illegal when the trial court lacks authority to impose it. *VanOven v. State*, 2011 Ark. App. 46, 380 S.W.3d 507. Because sentencing is entirely a matter of ₁₄statute, the circuit court has the authority to impose a particular sentence only when it complies with the applicable statute. *Glaze v. State*, 2011 Ark. 464, 385 S.W.3d 203.

We disagree that conspiracy is not a crime simply because the legislature has linked a conspiracy's classification to that of an object offense. Winkler does not cite any authority to support his novel contention that the crime of conspiracy does not exist. *Colbert v. State*, 2011 Ark. App. 507, 2011 WL 3925414 (refusing to consider an argument that presents no citation to authority or convincing argument).

We find no error in the trial court's sentencing of Winkler. The trial court complied with the applicable statutes and had the authority to impose a sentence of nine years' imprisonment with respect to Winkler's conviction for criminal conspiracy.

Affirmed.

PITTMAN and ABRAMSON, JJ., agree.

---

3. *See* Ark.Code Ann. § 5–4–401(a)(2) (Repl. 2006) (For a Class A felony, the sentence shall be not less than six years nor more than thirty years.).

4. We note that, whether Winkler was charged with conspiracy as a Class A felony or a Class C felony, his nine-year sentence was within the permissible range of punishment for either felony classification. *See* Ark.Code Ann. § 5–4–401(a)(2) in fn. 3; Ark.Code Ann. § 5–4–401(a)(4) (Repl.2006) (For a Class C felony, the sentence shall be not less than three years nor more than ten years.).